**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**MORDECHAI TWERSKY, ET AL.,**

                           **Plaintiffs,**                    **13 Civ. 4679 (JGK)**

           **- against -**                                    **OPINION AND ORDER**

**YESHIVA UNIVERSITY, ET AL.,**

                           **Defendants.**

---

**JOHN G. KOELTL, District Judge:**

The plaintiffs in this action are thirty-four former students of Yeshiva University High School for Boys ("YUHS"). Each of them alleges that he was abused by one or more of three individuals, two of whom were employed by YUHS, during the period from 1971 to 1992. The plaintiffs have brought this action not against their individual abusers, but against YUHS, Yeshiva University ("YU"), former administrators of YU, and several unnamed members of the Board of Trustees of YUHS and YU, asserting causes of action for fraud, negligence, violation of New York's General Business Law, and violation of Title IX of the Education Amendments Act of 1972 ("Title IX"). The defendants have moved to dismiss all of the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and, in the case of the allegations sounding in fraud, for failure to satisfy the heightened pleading

1

requirements of Federal Rule of Civil Procedure 9(b).  The plaintiffs oppose the defendants' motion and have also cross-moved for leave to file a Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a).

The defendants' motion is based for the most part on the claim that the statutes of limitations for all of the plaintiffs' federal and state claims have expired.  Statutes of limitations strike a balance between providing a reasonable time for victims to bring their claims while assuring that defendants have a fair opportunity to defend themselves before evidence is lost or memories fade.  In this case, the statutes of limitations have expired decades ago, and no exceptions apply.  Therefore, for the reasons explained below, the defendants' motion is granted, the plaintiffs' motion is denied, and the plaintiffs' Amended Complaint ("Complaint") is dismissed.


I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely

to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  Federal Rule of Civil Procedure 8(a)(2) requires that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

Claims that sound in fraud must meet the heightened pleading standard of Rule 9(b).  See, e.g., Marino v. Grupo Mundial Tenedora, S.A., 810 F. Supp. 2d 601, 606 (S.D.N.Y. 2011).  Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements

3

were made, and (4) explain why the statements were fraudulent."
ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d
Cir. 2007).

When presented with a motion to dismiss pursuant to Rule
12(b)(6), the Court may consider documents that are referenced
in the complaint, documents that the plaintiff relied on in
bringing suit and that are either in the plaintiff's possession
or that the plaintiff knew of when bringing suit, or matters of
which judicial notice may be taken.  See Chambers v. Time
Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also City of
Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F.
Supp. 2d 395, 401 (S.D.N.Y. 2011).

"Where the dates in a complaint show that an action is
barred by a statute of limitations, a defendant may raise the
affirmative defense in a pre-answer motion to dismiss."  Ghartey
v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989);
see also Singleton v. Clash, No. 12 Civ. 8465, 2013 WL 3285096,
at *1 (S.D.N.Y. July 1, 2013).


II.

The following allegations are assumed to be true for the
purposes of this motion.

4

A.

Defendant YUHS is a private college preparatory high school located in New York, New York.  Defendant YU is a private undergraduate university, also located in New York, New York. YUHS and YU are affiliated schools, and YU and its Board of Directors closely managed, directed, and controlled YUHS during the entire time period relevant to this action.

Defendant Norman Lamm is a former president and chancellor of YU, and Defendant Robert Hirt is the vice president of Rabbi Isaac Elchanan Theological Seminary, which oversees operations at YUHS, including disciplinary issues and student and parent complaints.  Hirt also served from 1986 to the present as a special advisor to the president of YU. Defendants James Does One through Thirty and Joseph Does One through Thirty were various members of the YU Board of Trustees and the YUHS Board of Trustees, respectively, during the period from 1971 to the present.

B.

The plaintiffs attended YUHS at various times during the period from 1968 to 1992.[1]  They are now roughly aged between

---

[1] The Complaint contains no allegations as to how old the plaintiffs are; the only indications of the plaintiffs' ages are the dates during which they attended YUHS.  For purposes of this

their late thirties and early sixties.  During their time at YUHS, all plaintiffs were abused by one or more of three individuals: George Finkelstein, Macy Gordon, and Richard Andron.

Between 1971 and 1995, Finkelstein was employed as assistant principal, associate principal, and eventually principal of YUHS.  During his time as an administrator at YUHS, Finkelstein is alleged to have abused nearly all of the plaintiffs physically and sexually in his office, at the YUHS dormitory, and in his private residence.  The abuse included groping, "humping," wrestling, inappropriate touching, and punching and other physical violence.

Beginning at some time in the 1970s and concluding in 1984, Gordon was employed at YUHS as a Judaic Studies faculty member. During his tenure at YUHS, Gordon also repeatedly sexually abused seven of the plaintiffs.  Gordon groped, assaulted, sodomized, and sexually tortured one or more of his victims.

Andron was never employed by either YUHS or YU at any relevant point in time.  He is a former student of YU, and a former friend of Finkelstein and Plaintiff John Doe Eleven.

---

motion, the Court will assume that each plaintiff was eighteen years old when he left YUHS.  Given the timing of the events at issue here, any plausible discrepancy between this assumption and the plaintiffs' actual ages is immaterial.

During the early 1980s, Andron periodically invited three of the plaintiffs to his New York City apartment and sexually abused them while they were there.  The abuse consisted of fondling and molesting.  The Complaint also alleges that Andron was permitted to roam the halls of a school dormitory and enter students' rooms as he pleased.

                                    C.

    The abuse of YUHS students, at least by Finkelstein, was allegedly known to several administrators of YUHS and YU prior to all incidents of abuse perpetrated against each of the plaintiffs in this action.  Multiple YUHS students had already been abused, at least by Finkelstein, by the time the first acts of abuse alleged in the Complaint were committed against the plaintiffs here, and school administrators had knowledge of these prior acts of abuse because they were reported to the administration, including to Defendants Lamm and Hirt, and because they sometimes occurred at school facilities and were observed by school employees.  Prior sexual assaults by Gordon were also reported to YUHS and YU administrators.  Moreover, nine of the thirty-four plaintiffs put school officials on notice of the risk of abuse by reporting their abuse to the school administration.

                                    7

There is no indication in the Complaint that the defendants took any remedial action on the basis of their awareness of the sexual abuse that had occurred.  To the contrary, the defendants allegedly failed to disclose to parents, teachers, or any law enforcement authorities that Finkelstein, Gordon, and Andron had committed acts of abuse against YUHS students.  Aside from a few isolated incidents, the defendants also failed to take any disciplinary actions against Finkelstein.  Gordon was fired in 1984 in response to complaints received by the school that he had sexually abused students, but the basis for his firing was not publicly disclosed.

Moreover, on multiple occasions, both Finkelstein and Gordon were lauded at public ceremonies and in school publications for their strong moral character, and they were represented to be in good standing at the school.  Indeed, even after Gordon was fired for sexual misconduct, he was honored at a school dinner in 2002, and YU accepted a gift to establish a scholarship in his name.

Most of those plaintiffs who reported their abuse to the school allege that they were "informed or led to believe" that their "complaint[s] w[ere] baseless," which resulted in their being "affirmatively deceived in [their] efforts to learn the truth."  (See Am. Compl. ¶¶ 125, 209, 250, 292, 436, 600, 611;

8

see also Am. Compl. ¶ 165 ("[John Doe Two] was informed and led
to believe that his complaint was one of first impression and
that no such allegations had ever been leveled against
Gordon.").)

Some plaintiffs also allege more specifically that they
were dissuaded from taking any action on their complaints.  John
Doe Fifteen informed several faculty members and administrators,
including Lamm, of the abuse he suffered at the hands of
Finkelstein in the late 1970s and early 1980s.  In response, one
faculty member informed Doe Fifteen that his allegations were
"more fantasy than reality," and he urged Doe Fifteen to seek
psychological counseling.  (Am. Compl. ¶ 192.)  Another faculty
member told Doe Fifteen that it was "better to drop the matter."
(Am. Compl. ¶ 196.)  The chairman of the YUHS Board of Directors
at the time responded to Doe Fifteen's allegations by removing
the door to Finkelstein's office, where some of the abuse had
occurred, but he took no disciplinary action against
Finkelstein.  Lamm, who was informed of Doe Fifteen's abuse in
1984, told Doe Fifteen that he would look into the matter, but
took no remedial action.

Similarly, in or about 1983, John Doe Sixteen reported to
the YUHS head dormitory counselor, as well as several of his
friends, that he had been abused by Finkelstein.  One such

9

friend, Yitzhak Twersky, told his brother, Plaintiff Mordechai Twersky, who in turn relayed this information to Lamm.  Lamm reacted "in disbelief and then anger that no one had told him about [this] before."  (Am. Compl. ¶ 425.)  Lamm "said over and over that he couldn't believe it, and that he never before heard such an allegation about Finkelstein, as if trying to convince [Twersky] that he knew nothing about it."  (Am. Compl. ¶ 425.) At some subsequent point, Lamm was seen reprimanding Finkelstein, but Lamm did not notify anyone of Doe Sixteen's allegations or take any other remedial actions.

D.

In December 2012, Paul Berger of the Jewish Daily Forward published an interview with Lamm concerning allegations of sex abuse at YUHS.  In the interview, Lamm stated, "If it was an open-and-shut case, I just let [the staff member] go quietly. It was not our intention or position to destroy a person without further inquiry."  (Am. Compl. ¶ 5 (alteration in original).)

On July 1, 2013, Lamm resigned from his position at YU.  In his resignation letter, he stated that "at the time that inappropriate actions by individuals at Yeshiva were brought to my attention, I acted in a way that I thought was correct, but which now seems ill conceived . . . [.]  I now recognize that I

was wrong[.]"  (Am. Compl. ¶ 7 (first and third alterations in original).)

The plaintiffs allege that they could not have known about the defendants' awareness of the sex abuse at YUHS until the "length and extent of the cover up was first presented" in the Jewish Daily Forward.  (See, e.g., Am. Compl. ¶ 125.)


E.

Plaintiffs Barry Singer, Mordechai Twersky, and John Does One through Seventeen filed this lawsuit on July 8, 2013—roughly twenty-one years after the last plaintiff left YUHS.  On August 15, 2013, an Amended Complaint was filed, which included fifteen new plaintiffs (John Does Eighteen through Thirty-Two).  All plaintiffs bring claims for fraudulent inducement (Count I), negligent infliction of emotional distress (Count II), intentional infliction of emotional distress (Count III), deceptive business practices and false advertising in violation of New York General Business Law §§ 349 and 350 (Counts IV and V), negligent misrepresentation (Count VI), negligent supervision and retention (Count VII), and violation of Title IX (Count VIII).  The defendants have moved to dismiss all of the plaintiffs' claims.  The plaintiffs cross moved for leave to file a Second Amended Complaint in the event that the Court

dismisses the claims in their First Amended Complaint.  The
Court has jurisdiction over the plaintiffs' Title IX claim
pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over
the state-law claims pursuant to 28 U.S.C. § 1367.


                              III.

        As explained in more detail below, all of the claims in
the Complaint are prima facie time-barred.  Accordingly, the
claims survive the defendants' statute-of-limitations-based
defense only if the plaintiffs have plausibly alleged that they
fall within an exception to the applicable statutes of
limitations.  See, e.g., Singleton, 2013 WL 3285096, at *4-10;
Fezzani v. Bear, Stearns & Co., No. 99 Civ. 0793, 2005 WL
500377, at *7-8 (S.D.N.Y. Mar. 2, 2005).  The plaintiffs argue
that each of their claims falls into one or more of three such
exceptions: the federal discovery rule, which postpones accrual
of certain claims arising under federal law; the state-law
doctrine of equitable estoppel, which tolls the statutes of
limitations applicable to certain claims when they have been
concealed from plaintiffs by defendants' wrongdoing; and the
state-law discovery rule, which postpones accrual of state-law
claims sounding in fraud.


                              12

A.

The plaintiffs allege that Defendants YUHS and YU are liable to them under Title IX because these defendants were deliberately indifferent to known acts of sex discrimination—namely, abuse by Finkelstein and Gordon—that occurred under their control.  Title IX generally provides, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  The defendants argue that the plaintiffs' Title IX claim should be dismissed because it is untimely as a matter of law, and because no cause of action under Title IX existed for the conduct alleged in the Complaint during the period in which the conduct is alleged to have occurred.

Title IX does not contain a statute of limitations, and the four-year federal catch-all statute of limitations in 28 U.S.C. § 1658(a) is inapplicable.  Curto v. Edmundson, 392 F.3d 502, 504 (2d Cir. 2004) (per curiam) (citing Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 381-82 (2004)).  Accordingly, courts apply "the most appropriate or analogous state statute of limitations" to Title IX claims.  Id. (quoting Goodman v. Lukens

Steel Co., 482 U.S. 656, 660 (1987)).  Moreover, "[t]he
borrowing of a state-law statute of limitations carries with it
the borrowing of the state's coordinate tolling rules," at least
where such rules are not inconsistent with the letter and
purpose of relevant provisions of federal law.  Zimmerman v.
Poly Prep Country Day Sch., 888 F. Supp. 2d 317, 333 (E.D.N.Y.
2012) (quoting Bd. of Regents v. Tomanio, 446 U.S. 478, 484
(1980)) (internal quotation marks omitted).  In assessing the
relevant statute of limitations, the Court of Appeals for the
Second Circuit has determined that Title IX actions are most
analogous to personal injury actions.  Curto, 392 F.3d at 504.
In New York, the statute of limitations for personal injury
actions is three years from the accrual of the cause of action.
N.Y. C.P.L.R. § 214(5) (McKinney 2013).  When a person entitled
to bring a cause of action is an infant, this statute of
limitations is tolled until that person reaches the age of
eighteen; for a three-year statute of limitations, the
limitations period would expire when the person reaches the age
of twenty-one.  Id. § 208; Zimmerman, 888 F. Supp. 2d at 337.
All of the plaintiffs in this action were infants at the time
the conduct allegedly giving rise to their Title IX claim
occurred, and all of them reached the age of twenty-one more

than two decades before this action was commenced.  Accordingly, the Title IX claim is prima facie time-barred.

The plaintiffs do not dispute the applicability of the New York statute of limitations and "coordinate tolling rules" to their claims.  Rather, they argue that their claims did not accrue until the interview with Lamm was published in the Jewish Daily Forward in December 2012, and that the three-year limitations period applicable to their Title IX claim under New York law has therefore not yet expired.

It is well established that in a federal question case in which the limitations and tolling rules are culled from state law, federal common law determines the date on which that federal claim accrues.  See Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007); Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002).  Accordingly, federal law governs the question of when the plaintiffs' Title IX claim accrued.

In support of their argument for delayed accrual until December 2012, the plaintiffs rely on the federal "discovery rule"—a rule that arose in the context of fraud cases "as an exception to the general limitations rule that a cause of action accrues once a plaintiff has a complete and present cause of action."  Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 644 (2010) (internal quotation marks omitted).  Under the discovery

15

rule, "[t]he clock [on the limitations period] begins to run when the plaintiff has 'inquiry notice' of his injury, namely, when he discovers or reasonably should have discovered the . . . injury." Singleton, 2013 WL 3285096, at *6 (first and third alterations in original) (quoting Koch v. Christies Int'l PLC, 699 F.3d 141, 148 (2d Cir. 2012)).  The plaintiffs assert that they could not have reasonably discovered their Title IX claim until they read the December 2012 Jewish Daily Forward article, and that the discovery rule should therefore save that claim from the otherwise applicable time bar.

1.

"In common parlance a right accrues when it comes into existence . . . ." Singleton, 2013 WL 3285096, at *4 (quoting Gabelli v. SEC, 133 S. Ct. 1216, 1220 (2013)).  "Thus the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'" Id. (quoting Gabelli, 133 S. Ct. at 1220).  The complete-and-present-cause-of-action rule fosters "basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." Id. (quoting Gabelli, 133 S. Ct. at 1220).  For this reason, the Supreme Court has emphasized that exceptions to

16

the standard rule are limited.  See, e.g., Gabelli, 133 S. Ct. at 1224.   Other than in cases of fraud or concealment, the Supreme Court has recognized a discovery rule in only two contexts, latent disease and medical malpractice, "where the cry for such a rule is loudest." Singleton, 2013 WL 3285096, at *5 (quoting TRW Inc. v. Andrews, 534 U.S. 19, 27-28 (2001)).

Nevertheless, in recent years, "both state and federal courts have applied forms of the 'discovery rule' to claims other than fraud." Merck, 559 U.S. at 645  (citing 2 C. Corman, Limitation of Actions §§ 11.1.2.1, 11.1.2.3, pp. 136-142, and nn. 6-13, 18-23 (1991 and 1993 Supp.)).  For example, the Second Circuit Court of Appeals has repeatedly applied a form of the discovery rule to claims arising under 42 U.S.C. § 1983.  See, e.g., Pinaud v. County of Suffolk, 52 F.3d 1139, 1156 (2d Cir. 1995) (affirming that a § 1983 claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action"); Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980) (same).

The plaintiffs rely on these cases for the proposition that the discovery rule is applicable here.  However, in doing so, they ignore the continuing significance of the "standard rule" that claims accrue upon existence of a complete and present cause of action, to which the discovery rule remains—despite

17

certain departures—an exception. See TRW Inc., 534 U.S. at 27
("[T]he proposition that equity tolls the statute of limitations
in cases of fraud or concealment . . . does not establish a
general presumption applicable across all contexts.").

Moreover, the plaintiffs point to only one case, Beasley v.
Alabama State University, 966 F. Supp. 1117 (M.D. Ala. 1997), in
which the federal discovery rule has been found applicable to a
Title IX claim.  Beasley cites multiple cases involving § 1983
claims for the proposition that "[u]nder federal law, a cause of
action accrues the moment the plaintiff knows or has reason to
know of the injury that is the basis of [the] complaint."  966
F. Supp. at 1128 (second alteration in original) (collecting
cases).

If the standard complete-and-present-cause-of-action rule
governed accrual of the Title IX claim in this case, all of the
plaintiffs' Title IX claims would be time-barred.  Each
plaintiff's Title IX claim accrued under the standard accrual
rule when, despite their knowledge of the abuse at the school,
the school administrators failed to take corrective actions.
See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281,
289-90 (1998) (setting forth the elements of the implied private
right of action arising under 20 U.S.C. § 1681).  In each
instance, this occurred before the plaintiffs left the school,

which in all cases was more than twenty years before this lawsuit was filed.  (See Am. Compl. ¶¶ 37-70; Compl. at 148.)

The Court of Appeals for the Second Circuit has not determined whether a discovery rule should be applied to Title IX cases.  And, while the Supreme Court has repeatedly expressed reluctance to extend a general federal discovery rule beyond cases of fraud, latent disease, and medical malpractice, it has decided recent cases narrowly on the grounds that specific statutes did not provide for a discovery rule.  See, e.g., Gabelli, 133 S. Ct. at 1221-24; TRW Inc., 534 U.S. at 27-28.  In this case, it is unnecessary to resolve whether Title IX includes a discovery rule, because the plaintiffs' Title IX claims fail even under the discovery rule.

2.

The discovery rule provides that "[t]he clock begins to run when the plaintiff has 'inquiry notice' of his injury, namely when he discovers or reasonably should have discovered the . . . injury."  Singleton, 2013 WL 3285096, at *7 (alterations in original) (quoting Koch v. Christies' Int'l PLC, 699 F.3d 141, 148 (2d Cir. 2012)).  "[I]n applying a discovery accrual rule, [the Supreme Court] ha[s] been at pains to explain that discovery of the injury, not discovery of the other elements of

19

a claim, is what starts the clock." Rotella v. Wood, 528 U.S. 549, 555 (2000). Thus, "[u]nder the discovery rule, a claim accrues when a plaintiff comes into possession of the critical facts that he has been hurt and who inflicted the injury." Singleton, 2013 WL 3285096, at *7 (quoting Rotella, 528 U.S. at 556) (internal quotation marks omitted). Put somewhat differently, a claim has accrued "when the plaintiff knows, or should know, enough to protect himself by seeking legal advice." A.Q.C. ex. rel. Castillo v. United States, 656 F.3d 135, 142 (2d Cir. 2011) (quoting Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998)) (internal quotation marks omitted). At that juncture, a plaintiff's failure to investigate his claim will not be excused by delayed accrual, because delaying accrual would undermine the purposes of the applicable statute of limitations. United States v. Kubrick, 444 U.S. 111, 123-24 (1979). This is true even if identifying the elements of a complete cause of action is "a matter of real complexity" because the elements themselves are complex or concealed. See Rotella, 528 U.S. at 556 (noting that the difficulty inherent in discovering a pattern of predicate acts as required for a RICO claim or professional negligence as required for a medical malpractice claim under the Federal Tort Claims Act does not

20

prevent such claims from accruing once the relevant injury has been discovered).

The plaintiffs argue that accrual of their Title IX claim did not occur until Lamm admitted in an interview with the Jewish Daily Forward in December 2012 that he and other administrators had been aware of the risk of sexual abuse at YUHS when it was occurring.  Before this point, the plaintiffs contend that they were unaware that the school defendants had injured them, and unable with reasonable diligence to discover the school officials' deliberate indifference to "actual knowledge" that school employees posed a substantial risk of sexually abusing students, as required for bringing a claim under Title IX.  See Gebser, 524 U.S. at 290.

This argument confuses knowledge of the existence of a legal right with knowledge of injury, contrary to the Supreme Court's teaching that the former has no bearing on accrual under the discovery rule.  See Kubrick, 444 U.S. at 122 ("We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment.").  Discovery of injury is what starts the clock, regardless of how complex or difficult to discover the elements

of the cause of action may be.[2]   <u>Rotella</u>, 528 U.S. at 555-56.

The plaintiffs were aware of their abuse at the time it

occurred, and of the identity of their abusers and those who

employed them—thus, had the plaintiffs approached an attorney

prior to their turning twenty-one, they could have brought their

claims under Title IX.[3]   See <u>Singleton</u>, 2013 WL 3285096, at *9;

---

[2] Some of the plaintiffs allege that they made inquiry into the
schools' awareness of the risk of abuse at YUHS.  (<u>See</u> Am.
Compl. ¶¶ 124, 164, 208, 249, 291, 435, 599, 610.)  They did so
by notifying school officials that they had been abused, which
served the dual purpose of "alert[ing] the school concerning
[the abusers'] criminal conduct AND [] investigat[ing] whether
or not the school was aware of [the abusers'] predilection to
abuse young boys."  (<u>See, e.g.</u>, Am. Compl. ¶¶ 124, 164.)
Although the discovery rule is sometimes phrased as imposing a
"duty of inquiry" upon a putative plaintiff, <u>see, e.g.</u>, <u>Stone v.
Williams</u>, 970 F.2d 1043, 1049 (2d Cir. 1992), not just any
inquiry will do.  The plaintiff must have sufficient information
about his injury and the perpetrator so that he can protect
himself by seeking legal advice.  See <u>A.Q.C. ex rel. Castillo</u>,
656 F.3d at 142; <u>Singleton</u>, 2013 WL 3285096, at *7.  Thus,
allegations that some of the plaintiffs informed school
officials of their abuse and, despite doing so, did not learn
that the school had prior knowledge of the risk of abuse, do
not, without more, satisfy any duty of inquiry, nor do they
alter application of the basic rule that the plaintiffs'
knowledge of their injuries started the clock.  The plaintiffs
knew that they were injured, and the most basic inquiry would
have disclosed that the perpetrators remained employed at YUHS.

[3] The defendants argue that no cause of action of the sort
alleged here was available under Title IX during the time period
in which the conduct giving rise to the plaintiffs' Title IX
claim occurred.  They contend that the elements of a Title IX
private right of action against a school for sexual abuse by

<u>cf.</u> <u>Zimmerman</u>, 888 F. Supp. 2d at 337 (citing various state court cases that find, on the basis of state law rules governing accrual, that knowledge of sexual abuse combined with knowledge of who employs the abuser causes claims against the employers to accrue).  The Title IX claims, which are otherwise time-barred, would therefore not be salvaged by the federal discovery rule.

Because this action was filed more than three years after each plaintiff should have become aware of the alleged Title IX violation, even taking account of tolling for infancy, the federal discovery rule would not save the Title IX claim from the applicable time bar.

---

teachers and administrators had not been defined by the Supreme Court until it decided <u>Gebser</u>, 524 U.S. 274, in 1998.  The plaintiffs counter that Supreme Court interpretations of Title IX are retroactively applicable, and that "Plaintiffs' rights and remedies under Title IX . . . were available to them since Title IX's enactment on June 23, 1972." (Pls.' Mem. in Opp. to Mot. to Dismiss 8.)  Given that the Title IX claim is time-barred, it is not necessary to reach the question of whether Supreme Court interpretations of Title IX can be applied retroactively to the conduct at issue here.  However, it should be noted that by the plaintiffs' own reasoning, their cause of action under Title IX existed at the time the plaintiffs allege they were injured; accordingly, had they sought legal advice to investigate diligently the possibility of bringing a claim at some point prior to turning twenty-one, they could have discovered this cause of action and pursued their Title IX claim in a timely fashion.  Moreover, even after the <u>Gebser</u> decision in 1998, the plaintiffs waited approximately fifteen years before bringing the present case—far in excess of the three-year statute of limitations.

B.

The remainder of the plaintiffs' claims are asserted under
Yew York State law.  Those claims include causes of action for
fraudulent inducement (Count I), negligent infliction of
emotional distress (Count II), intentional infliction of
emotional distress (Count III), deceptive business practices and
false advertising in violation of New York General Business Law
§§ 349 and 350 (Counts IV and V), negligent misrepresentation
(Count VI), and negligent supervision and retention (Count VII).
Even with tolling for infancy, these claims, which were brought
approximately two decades after the last plaintiff turned
twenty-one, are time-barred.  See N.Y. C.P.L.R. § 208
(permitting tolling for infancy of up to three years after
infancy ends); Gristede's Foods, Inc. v. Unkechauge Nation, 532
F. Supp. 2d 439, 452 (E.D.N.Y. 2007) ("New York courts have
uniformly applied a three-year statute of limitations to [New
York General Business Law] section 349 and section 350 cases.");
Goldstein v. Mass. Mut. Life Ins. Co., 820 N.Y.S.2d 852, 853-54
(App. Div. 2006) (Slip Op.) ("[C]ause[s] of action to recover
damages for fraud [are] barred by the six-year statute of
limitations. . . . [C]auses of action alleging intentional and
negligent infliction of emotional distress . . . are barred by
the one-year statute of limitations for intentional torts to the

24

extent that they allege intentional conduct, or the three-year statute of limitations governing personal injury claims insofar as they allege negligent conduct." (citing N.Y. C.P.L.R. §§ 213(8), 214, 215)).  The plaintiffs do not dispute that these claims are prima facie time-barred, but they argue that the defendants should be estopped from asserting their statute-of-limitations defense under the state-law doctrine of equitable estoppel.[4]

---

[4] The plaintiffs also assert that equitable estoppel salvages their Title IX claim, to the extent that their arguments for application of the federal discovery rule fail.  There is no question that the New York state doctrine of equitable estoppel is applicable to state-law causes of action in federal court. See, e.g., Bisson v. Martin Luther King Jr. Health Clinic, 399 F. App'x 655, 656 (2d Cir. 2010) ("In an earlier appeal in this case, we affirmed the District Court's finding that Plaintiff had not timely filed her claim under New York law, but we remanded to allow the Plaintiff to raise the [state-law] doctrine of equitable estoppel before the District Court."); Fezzani, 2005 WL 500377, at *7 ("Breach of fiduciary duty is a state-law tort and a state statute of limitations applies. Therefore, the question is whether Plaintiffs have adequately pled facts to relieve them from the statute of limitations as a matter of New York law.").  However, courts are divided on the question of whether equitable exceptions to state statutes of limitations can be applied to federal causes of action when they are inconsistent with applicable federal rules of tolling and accrual.  See Pearl, 296 F.3d at 83-84 (collecting cases and finding it unnecessary to resolve the split for present purposes).  Nevertheless, it is unnecessary to resolve the question of whether the concealment alleged by the plaintiffs of various elements of their Title IX claim should be classified as relating to accrual, and therefore governed by federal law, or

Equitable estoppel is an "extraordinary remedy." Pulver v. Dougherty, 871 N.Y.S.2d 495, 496 (App. Div. 2009) (Slip Op.); E. Midtown Plaza Hous. Co. v. City of New York, 631 N.Y.S.2d 38, 38 (App. Div. 1995).  Under New York law, the doctrine should be "invoked sparingly and only under exceptional circumstances." Abercrombie v. Andrew Coll., 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006) (quoting Matter of Gross v. New York City Health & Hosps. Corp., 505 N.Y.S.2d 678, 679 (App. Div. 1986)).

"The doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense." Zumpano v. Quinn, 849 N.E.2d 926, 929 (N.Y. 2006).  This is the case where a plaintiff is "induced by fraud, misrepresentations or deception to refrain from filing a timely action." Id. (quoting Simcuski v. Saeli, 377 N.E.2d 713, 716 (N.Y. 1978)) (internal quotation marks omitted).  Such fraud, misrepresentations, or deception must be affirmative and specifically directed at preventing the plaintiff from bringing suit; failure to disclose the basis for potential claims is not

---

as relating to tolling, and therefore governed by New York law, because this claim would be barred either way: the federal discovery rule does not salvage the Title IX claim, and, as discussed below, neither does the state-law doctrine of equitable estoppel.  Cf. id. (reaching the same conclusion in assessing tolling and accrual issues relating to a § 1983 claim).

enough, nor are broad misstatements to the community at large.
See Doe v. Kolko, No. 06 Civ. 2096, 2008 WL 4146199, at *4
(E.D.N.Y. Sept. 5, 2008) ("Equitable estoppel is appropriate
where the plaintiff is prevented from filing an action within
the applicable statute of limitations due to defendants'
misconduct toward the potential plaintiff, not a community at
large."); Putter v. N. Shore Univ. Hosp., 858 N.E.2d 1140, 1142
(N.Y. 2006) ("A plaintiff seeking to apply the doctrine of
equitable estoppel must establish that subsequent and specific
actions by defendants somehow kept [him or her] from timely
bringing suit." (alteration in original) (citation and internal
quotation marks omitted)); Zumpano, 849 N.E.2d at 929 (same).

Absent affirmative conduct on the part of the defendant,
"the plaintiff must demonstrate a fiduciary relationship . . .
which gave the defendant an obligation to inform him or her of
facts underlying the claim."  Zumpano, 849 N.E.2d at 930
(citation omitted); see also Okie v. Village of Hamburg, 609
N.Y.S.2d 986, 989 (App. Div. 1994) (finding equitable estoppel
inapplicable in part because "[t]his [wa]s not a case where
plaintiffs made specific inquiry for information peculiarly
within the municipality's knowledge and received erroneous
information upon which they relied").

In order to invoke equitable estoppel, a plaintiff must also demonstrate reasonable reliance on the defendant's misrepresentations, and due diligence in bringing a claim when the conduct relied upon as the basis for equitable estoppel ceases to be operational.  <u>Putter</u>, 858 N.E.2d at 1142-43; <u>Zumpano</u>, 849 N.E.2d at 929, 931.  Generally, the outer limit for exercising due diligence would be the statute of limitations measured from the date when the facts giving rise to the estoppel have ceased to be operational.  See <u>Simcuski</u>, 377 N.E.2d at 717; <u>Doe v. Holy See (State of Vatican City)</u>, 793 N.Y.S.2d 565, 569 (App. Div. 2005) (Slip Op.); <u>Lazzaro v. Kelly</u>, 450 N.Y.S.2d 102, 105 (App. Div. 1982).

When the claims are prima facie barred by the statute of limitations, the plaintiff must make sufficient factual allegations that each of the requirements of equitable estoppel is satisfied, or at least raise an issue of fact as to whether equitable estoppel applies.  See, e.g., <u>Santo B.</u>, 861 N.Y.S.2d at 675.[5]

---

[5] Federal courts follow New York law in requiring a plaintiff to plead each element of equitable estoppel with particularity. See <u>Abercrombie</u>, 438 F. Supp. 2d at 265 ("[W]ithout adequate pleading, [equitable estoppel] is not properly raised and therefore cannot defeat a motion to dismiss based on statute of limitations grounds." (citation omitted)); <u>Fezzani</u>, 2005 WL 500377, at *8 ("Plaintiffs have not alleged that Defendants' conduct in withholding records in other matters made it

Two authoritative cases from the New York Court of Appeals illustrate the limits of the extraordinary doctrine of equitable estoppel.  In Putter, the Court of Appeals declined to recognize a valid equitable estoppel defense where the plaintiff contracted Hepatitis C by virtue of the alleged negligence of the defendant hospital.  858 N.E.2d at 1141-43.  The plaintiff became aware that he had contracted the disease a few months after the surgery, and was then advised by multiple medical professionals that he likely contracted it at the hospital.  Id. at 1141.  The plaintiff was also informed that another patient

_____

impossible for them to discover that Defendants aided and abetted Baron's breach of fiduciary duty.").  They have also typically concluded that "[b]ecause Rule 9(b) applies to all 'averments of fraud,' [p]laintiffs must plead the fraudulent concealment on which their equitable estoppel allegations are based with particularity . . . ."  Fezzani, 2005 WL 500377, at *8; see also Rafter v. Liddle, 704 F. Supp. 2d 370, 377-78 (S.D.N.Y. 2010).  But see Bild v. Konig, No. 09 Civ. 5576, 2011 WL 666259, at *6 (S.D.N.Y. Feb. 14, 2011) ("The equitable estoppel asserted by Plaintiff, however, while equitable in nature, is not a cause of action or a defense—it is rather an equitable bar to the assertion of the affirmative defense of statute of limitations.  Accordingly, Rule 9(b), governing pleadings, should not apply." (internal citation and quotation marks omitted)).  In this case, the plaintiffs do not dispute that when a claim is prima facie time-barred, they are required to "aver evidentiary facts" establishing equitable estoppel or raising an issue of fact as to whether equitable estoppel applies.  (Pls.' Mem. in Opp. to Mot. to Dismiss 26.)  Because, as explained below, the plaintiffs have failed to satisfy this standard, there is no occasion to address whether their allegations must also satisfy Rule 9(b).

had recently contracted the same disease after surgery at the same hospital.  Id.  Nevertheless, the chief of infectious diseases at the hospital falsely told the plaintiff that the plaintiff's disease was of unknown origin.  Id.  The Court of Appeals held as a matter of law that this representation was not a proper basis for equitable estoppel because "given [the plaintiff's] level of awareness" of his injury and its likely source, he "had sufficient information available to require him to investigate whether there was a basis for a medical malpractice action."  Id. at 1143.  Thus, "any reliance [the plaintiff] placed on []his conversation with [the chief of infectious diseases]—a person affiliated with the defendant hospital—was unreasonable.  [The] statement did not alter [the plaintiff's] timely awareness of the facts requiring him to make further inquiry before the statute of limitations expired."  Id.

In Zumpano, the Court of Appeals considered the application of equitable estoppel to the filing of untimely claims alleging clerical sexual abuse of minors.  849 N.E.2d at 928-31.  In affirming the dismissal of two complaints alleging clerical sexual abuse, the Court of Appeals found equitable estoppel inapplicable as a matter of law.  Id.  The Court stressed that it is "fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by

defendants somehow kept them from timely bringing suit." Id. at 929 (citation omitted).  The Court rejected the equitable estoppel arguments because the defendants had not prevented the plaintiffs from learning of their claims:

> [E]ach plaintiff was aware of the sexual abuse he or she suffered at the hands of defendant priests. . . . Plaintiffs were likewise aware that the priests were employees of the dioceses and could have brought actions against the dioceses, or at least investigated whether a basis for such actions existed.  Plaintiffs do not allege they made timely complaints to the dioceses regarding clergy mistreatment.  Subsequent conduct by the dioceses did not appear in any way to alter plaintiffs' early awareness of the essential facts and circumstances underlying their causes of action or their ability to timely bring their claims.

Id.  The Court of Appeals also rejected the argument that conduct such as reassigning priests to new dioceses, failing to report allegations of abuse to law enforcement officials, and making private payments to complainants to prevent them from publicizing their abuse were sufficient to establish equitable estoppel.  Id. at 930.  The Court noted that such conduct was not fraudulent concealment as a matter of law; the plaintiffs had not alleged any "specific misrepresentation to them by defendants, or any deceptive conduct sufficient to constitute a basis for equitable estoppel."  Id.

The defendants argue 1) that the plaintiffs have failed to allege the type of specific, affirmative misrepresentation required for an equitable estoppel defense to the statute of

limitations; 2) that the plaintiffs have similarly failed to allege a fiduciary duty between the defendants and the plaintiffs sufficient to give rise to an obligation upon the defendants to disclose the risk of harm to the plaintiffs from their abusers; and 3) that the plaintiffs' equitable estoppel allegations fail for the additional reason that the misstatements alleged in the Complaint were not pleaded with the requisite factual support.

1.

The allegations in the Complaint that form the basis for the plaintiffs' equitable estoppel defense fall into three categories.  In the first category are allegations that the defendants failed to report known abuse to the authorities, failed to warn students and their families of the known risk of abuse, and failed to disclose the abuse publicly.  Absent a fiduciary relationship, such passive concealment falls short of the sort of specific and affirmative misrepresentation required to trigger an equitable estoppel defense.  See Zumpano, 849 N.E.2d at 929 ("It is not enough [for equitable estoppel purposes] that plaintiffs alleged defendants were aware of the abuse and remained silent about it."); Gleason v. Spota, 599 N.Y.S.2d 297, 299 (App. Div. 1993) (Mem. Op.) ("Where

concealment without actual misrepresentation is claimed to have prevented a plaintiff from commencing a timely action, the plaintiff must demonstrate a fiduciary relationship . . . which gave the defendant an obligation to inform him or her of facts underlying the claim." (citations omitted)).  As the Court of Appeals explained in Zumpano, "[a] wrongdoer is not legally obliged to make a public confession, or to alert people who may have claims against it, to get the benefit of a statute of limitations."  849 N.E.2d at 930.


2.

The second category of misrepresentations alleged in the Complaint are statements made to the school community at large about the trustworthiness and moral uprightness of the abusers. Thus, for example, after Plaintiff Twersky disclosed his abuse to Defendant Lamm, the schools are alleged to have

> continued to make frequent and regular representations, *in school events attended by students, and in school publications received by students*, *parents, former students, and alumni*, that Finkelstein was highly regarded by YUHS and YU, that Finkelstein remained in good standing, that Finkelstein was a man of strong moral character, that Finkelstein was a trustworthy man, and that Finkelstein was a positive role model for boys and well-suited to lead them in their journey to learning traditional Jewish principles and traditions and how to live based on the sacred tenets of the Torah.

33

(Am. Compl. ¶ 224 (emphasis added); see also Am. Compl. ¶¶ 229, 837-48, 850-55, 863-71, 876-78.)  These sorts of misrepresentations are also inadequate in light of the specificity requirement in the equitable estoppel standard; equitable estoppel is only "appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants' misconduct toward the potential plaintiff, not a community at large."[6]  Kolko, 2008 WL 4146199, at *4.

---

[6] In support of this theory of equitable estoppel, the plaintiffs rely on Zimmerman, 888 F. Supp. 2d 317.  In that case, the court concluded that affirmative representations at school events and in school publications as to the good standing of an alleged abuser could plausibly have led the plaintiffs "to falsely believe that [the school defendant] was unaware of [the abuser's] misconduct and could not be liable for negligent retention or supervision," such that the plaintiffs' allegations of equitable estoppel allowed their claims against the school to survive the prima facie time bar.  888 F. Supp. 2d at 340.

This position cannot be squared with Zumpano, in which the Court of Appeals found that the plaintiffs' failure to "allege any specific misrepresentation[s] to them by defendants" was fatal to their equitable estoppel defense.  849 N.E.2d at 930; see also Kolko, 2008 WL 4146199, at *4.  Accordingly, Zimmerman is unpersuasive.  Moreover, there is nothing about general statements to the community that prevented the plaintiffs from knowing that they were abused, who had abused them, and who employed their abusers.

3.

The plaintiffs attempt to augment these alleged passive concealments and general misstatements to the school community by arguing that the heightened duty of care owed by schools to their students, deriving from the fact that schools assume a quasi-parental role vis-a-vis the children in their custody (termed an "in loco parentis" relationship), renders all concealments and misrepresentations made in the context of this relationship sufficiently affirmative and specific, such that they qualify to trigger the equitable estoppel defense.  This is essentially a version of the estoppel-by-breach-of-fiduciary-duty argument that has been recognized on multiple occasions by the New York courts.  See, e.g., General Stencils, 219 N.E.2d 169, 171 (N.Y. 1966) (finding that alleging the "careful[] conceal[ment of a] crime" was sufficient to permit the plaintiff to "litigate the issue of equitable estoppel," where the plaintiff was an employer of the alleged wrongdoer who concealed her fraud during the limitations period); Erbe v. Lincoln Rochester Trust Co., 214 N.Y.S.2d 849, 852 (App. Div. 1961) ("[I]t should not be held that a trustee can take advantage of the limitations statute when the beneficiaries of the trust may have been led to believe that there was no breach of the

35

relationship by statements of false facts *or concealment of true facts* by the fiduciary." (emphasis added)).

The New York courts have not yet ruled on the question of whether a fiduciary relationship sufficient to trigger estoppel-by-passive-concealment exists between a school and its students, or whether such a duty is breached by the school's failure to disclose prior incidents of sexual abuse. However, it is not necessary to reach these questions here, because even assuming the in loco parentis relationship had the transformative effect upon the passive concealments and generalized misstatements asserted by the plaintiffs, any such relationship between the schools and the students ceased at the very latest when the students left or graduated. See, e.g., Zumpano, 849 N.E.2d at 930-31 (finding "no basis for a claim that any fiduciary duty [between priests and children in their care] continued after plaintiffs were adults"). According to the Complaint, all plaintiffs had left the school by 1992. At this point, "the conduct relied on [as a basis for equitable estoppel] cease[d] to be operational," and the plaintiffs were therefore required to proceed with their lawsuit within the statutory limitations period. Id. at 931 (first alteration in original) (quoting Simcuski, 377 N.E.2d at 717). Their failure to do so defeats

the possibility in this case of estoppel by passive concealment or by generalized misstatements.

4.

The final category of misrepresentation alleged in the Complaint as a basis for equitable estoppel is the claim by nine plaintiffs that they reported their abuse to YUHS and YU after it occurred, and that they were subsequently affirmatively deceived in various ways.  This allegation is made with varying degrees of specificity by Plaintiffs Twersky and Does One, Two, Thirteen, Fourteen, Fifteen, Sixteen, Thirty-One, and Thirty-Two.

Most commonly, these plaintiffs allege in general terms that they complained to YUHS and YU officials, and that they were "informed or led to believe" that their "complaint[s] w[ere] baseless," which resulted in their being "affirmatively deceived in [their] efforts to learn the truth."  (See Am. Compl. ¶¶ 125, 209, 250, 292, 436, 600, 611.)  Similarly, Doe Two alleges that he "was informed and led to believe that his complaint was one of first impression and that no such allegations had ever been leveled against Gordon."  (Am. Compl. ¶ 165.)

37

Such allegations are insufficient as a matter of law to establish an equitable estoppel defense to the prima facie showing that the claims are barred by the statute of limitations.  They fail to specify the content of the misrepresentations that were made, the timing of the misrepresentations, how the plaintiffs reasonably relied on the misrepresentations, and how the plaintiffs exercised due diligence in bringing the current Complaint.  The allegations are therefore too general to suffice as a basis for equitable estoppel.  Cf. Sang Lan v. Time Warner, Inc., No. 11 Civ. 2870, 2013 WL 1703584, at *25-26 (S.D.N.Y. Apr. 19, 2013) (Report and Recommendation of the Magistrate Judge); Abercrombie, 438 F. Supp. 2d at 266.

In Santo B., the Appellate Division affirmed the dismissal of a complaint as time-barred and rejected the plaintiff's assertion of equitable estoppel despite the plaintiff's allegation that he informed a representative of the defendant Archdiocese in 2001 about his claim of sexual abuse by an employee of the Archdiocese, that a representative of the Archdiocese denied him information regarding his abuser's location, and that he "reasonably relied" upon the Archdiocese to investigate and "make [him] whole."  861 N.Y.S.2d at 675-76 (alteration in original).  As the Appellate Division explained:

The plaintiff did not aver specific promises or statements
made by the respondents' representative which led the
plaintiff to believe that the Archdiocese was investigating
his claim, nor did the plaintiff do anything further after
this single meeting until four years later, when in 2005,
he filed the instant lawsuit.  Under the circumstances, the
plaintiff failed to establish reasonable reliance upon
misrepresentations or conduct of the respondents which
prevented him from timely filing.

Id. at 676 (citation omitted).

So too here.  Each of the nine plaintiffs who alleges that
he reported his abuse clearly knew that he was abused, who had
abused him, and who employed his abuser.  In light of this
knowledge, none of these nine plaintiffs explain how the
defendants' representations could plausibly have dissuaded them
from bringing suit.  These plaintiffs' general allegations are
therefore insufficient to establish reasonable reliance, and
cannot form the basis for an equitable estoppel defense.  See
Putter, 858 N.E.2d at 1143 ("[G]iven [the plaintiff's] level of
awareness . . . , equitable estoppel is inappropriate as a
matter of law.").

Indeed, in their papers, the plaintiffs do not explain or
even address how equitable estoppel could apply to the nine
plaintiffs who allege that they complained to school officials.
Each of those nine plaintiffs could tell from publicly available
information that the abusers continued to be employed by the
schools even after the schools had been informed of the abuse—

39

and yet these nine plaintiffs failed to bring their lawsuit until decades after their complaints went unanswered.

Of the nine plaintiffs who allege affirmative misrepresentations, Does Two, Fifteen, and Sixteen allege more particular misrepresentations.  Nevertheless, for similar reasons, these plaintiffs' allegations fail to supply a valid basis for an equitable estoppel defense.

Doe Two alleges that he met with an official of YU in 1980 and reported that he was abused by Gordon.  The official said he would inform Lamm of the complaint and take appropriate action, but no disciplinary or remedial measures were ultimately taken. (Am. Compl. ¶¶ 152-54.)

Despite containing more particulars about timing and content than the general allegations discussed above, this allegation is similarly devoid of any explanation as to how the alleged representation could have prevented Doe Two from bringing a timely action.  To the contrary, the Complaint highlights Doe Two's awareness of his abuse, of the identity of his abuser, and of who employed his abuser in 1980.  Nothing in Doe Two's allegations plausibly explains how the alleged misrepresentation by the school official could have prevented Doe Two from bringing a timely action in spite of his knowledge

40

of these facts.  Doe Two has therefore failed to allege
reasonable reliance on the alleged misrepresentation.

In a similar vein, Doe Fifteen alleges that on multiple
occasions he reported his abuse to school officials, and that in
response the officials made various sorts of affirmative
misstatements to him.  In 1982, Doe Fifteen informed a YU
faculty member that he had been abused by Finkelstein.  In
response, he was told that his accusations were "more fantasy
than reality."  (Am. Compl. ¶ 192.)  At some point between 1981
and 1985, Doe Fifteen informed another YU faculty member about
his abuse at the hands of Finkelstein, and that faculty member
allegedly told him "it was better to drop the matter."  (Am.
Compl. ¶ 196.)  In 1984, Doe Fifteen informed Lamm that he had
been abused, and Lamm allegedly promised to look into the
matter, but failed to do so.  (Am. Compl. ¶¶ 198-99.)  Finally,
at some point in the late 1980s, Doe Fifteen reported the abuse
to another school official, who allegedly accused him of
"spreading 'gossip.'"[7]  (Am. Compl. ¶ 203.)

---

[7] Doe Fifteen alleges that he made additional complaints to other
officials, but he does not allege that these complaints provoked
affirmative misrepresentations.  (See, e.g., Am. Compl. ¶¶ 197,
200, 204, 205.)  Accordingly, these allegations are insufficient
as a matter of law for the reasons explained in Sections III.B.1
and III.B.3, above.  For the same reasons, allegations by
Twersky that he complained about his abuse to school officials
in 1983, 2000, and 2001, and that no remedial actions were

For the same reasons, these allegations do not rise to the level of supporting a valid equitable estoppel claim.  There is no explanation in the Complaint as to how any of these alleged misrepresentations could plausibly have prevented Doe Fifteen from bringing a timely action, given that Doe Fifteen knew of his abuse, of who had abuse him, and of who employed his abusers.  To the contrary, in light of what he knew, it was unreasonable for Doe Fifteen to have relied on the alleged misstatements in delaying his suit for multiple decades.[8]

---

taken, (see Am. Compl. ¶¶ 218, 232-35, 244-46), cannot supply a basis for equitable estoppel.  Finally, the same reasoning applies to the allegation by Doe One that he reported his abuse to Lamm in 1980, and that Lamm asked him "what he had done to deserve being treated that way."  (Am. Compl. ¶ 342 (internal quotation marks omitted).)  This alleged statement does not constitute a misrepresentation that could plausibly have deceived Doe One into believing he had no cause of action at any point before he turned twenty-one.  Accordingly, the sole basis for Doe One's claim for equitable estoppel is the passive concealment of his cause of action, and absent a fiduciary duty, such a claim must fail.

[8] It is also notable that Doe Fifteen takes credit for causing Finkelstein to be fired from a school in Florida in about 1999 by disclosing Finkelstein's abuse to school administrators, but that Doe Fifteen did not bring his current claims until 2013. This casts serious doubt upon the contention that the effect of the conduct alleged to have given rise to the estoppel lasted until December 2012.  It also renders implausible any argument that Doe Fifteen acted with due diligence in bringing his claims.

42

Doe Sixteen alleges that he reported Finkelstein's abuse to Lamm through Plaintiff Twersky in approximately 1983. In response, Lamm reportedly said that "he couldn't believe it, and that he never before had heard such an allegation about Finkelstein." (Am. Compl. ¶ 425.) But there is no explanation how this alleged misrepresentation could have prevented Doe Sixteen—who knew he had been abused, who had abused him, and who employed his abuser—from pursuing his claim diligently after he reached the age of majority. Instead of doing so, Doe Sixteen waited approximately two and a half decades before bringing his claims. Accordingly, he has failed to allege reasonable reliance on Lamm's alleged misstatements.[9]

---

[9] A subset of the nine plaintiffs who reported their abuse—consisting of Twersky, Doe Fourteen, and Doe Thirty-Two—have alleged that school officials responded to their complaints by threatening them in various ways. However, the plaintiffs do not rely on duress as a basis for tolling the statutes of limitations for their claims. Moreover, these allegations do not support a claim of equitable estoppel.

Twersky alleges that a YU official met with him in Israel in 2000 and issued a "direct threat . . . designed to discourage Twersky from taking legal action against the YU defendants." (Am. Compl. ¶ 240.) The alleged threat was that if Twersky pursued his complaint, it "would not be good for [him] or for Yeshiva." (Am. Compl. ¶ 241.) This allegation does not support an equitable estoppel defense because the threat is alleged to have been made approximately nineteen years after Twersky left YUHS. It can therefore have had no effect on Twersky's ability to bring his claims within three years of turning eighteen.

5.

Because the plaintiffs have failed to plead a proper basis for their equitable estoppel claim, they do not have recourse to equitable tolling as a means to overcome the prima facie time bars that are applicable to their claims.  Given that equitable estoppel and the federal discovery rule are the only two statute-of-limitations exceptions alleged to apply to the claims in Counts II through VIII, these claims are time-barred and must therefore be dismissed.

C.

The plaintiffs' final effort to overcome the prima facie time bar relates exclusively to their claim for fraudulent

---

Similar claims of duress are also insufficient for Doe Fourteen, who alleges that Finkelstein punched him and threatened him in 1971 when Doe Fourteen was in school at YUHS, and for Doe Thirty-Two, who alleges that in about 1988 or 1989, he reported Finkelstein's abuse and was threatened and told to stay home from school for a few days.  These allegations are insufficient because they contain no explanations as to how the threats could have continued to have any effect on the plaintiffs after they graduated.  Cf. Holy See, 793 N.Y.S.2d at 569 ("Plaintiffs fail to demonstrate that any duress they may have experienced continued after they attained majority or broke all ties with the church." (citation omitted)); Zoe G. v. Frederick F.G., 617 N.Y.S.2d 370, 371 (App. Div. 1994) (finding it inappropriate to toll the limitations period because the plaintiff had failed to allege any acts of duress occurring after the plaintiff had reached majority).

inducement (Count I).  In Count I, the plaintiffs allege that
the defendants are liable because they knew of prior incidents
of abuse by Finkelstein, Gordon, and Andron, and misrepresented
the risk of abuse to current and future students in order to
induce the students to continue to enroll at YUHS or refrain
from leaving the school.  This claim is subject to a six-year
statute of limitations.  See N.Y. C.P.L.R. § 213(8).  However,
the New York state statute of limitations for fraud contains its
own discovery rule: "an action based upon fraud . . . must be
commenced [within] the greater of six years from the date the
cause of action accrued or two years from the time the plaintiff
or the person under whom the plaintiff claims discovered the
fraud, or could with reasonable diligence have discovered it."
Id.  The plaintiffs allege that they could not reasonably have
discovered the defendants' fraud until the Jewish Daily Forward
article was published in December 2012, and that the fraud claim
therefore did not accrue until this time.  However, it is not
necessary to reach the question of whether the New York fraud
discovery rule applies here, because the claim in Count I must
be dismissed for an independent reason.

Courts are wary of plaintiffs who cast their claims in
fraud for the sole purpose of using this rule to avoid a shorter
statute of limitations applicable to other claims in their

complaint.  See Powers Mercantile Corp. v. Feinberg, 490
N.Y.S.2d 190, 192 (App. Div. 1985) (citation omitted).   Thus,
fraud claims are dismissed when they appear to be "not essential
to the cause of action pleaded except as an answer to an
anticipated defense of statute of limitations."  Id. (citation
omitted).  Otherwise, "fraud would be used as a means to
litigate stale claims."  Id.  A fraud claim is essential to the
cause of action, rather than merely incidental, "only when: (1)
the fraud occurred separately from and subsequent to the injury
forming the basis of the alternate claim; and (2) the injuries
caused by the fraud are distinct from the injuries caused by the
alternate claim."  Corcoran v. N.Y. Power Auth., 202 F.3d 530,
545 (2d Cir. 1999) (citing Harkin v. Culleton, 554 N.Y.S.2d 478,
481-82 (App. Div. 1990)).  Under the second prong, injuries must
be truly distinct—exacerbation of the original injury due to an
alleged fraud does not constitute a separate injury.  Id.
(citations omitted).

The Complaint in this action contains two sorts of
allegations of fraud.  On the one hand, the defendants are
alleged to have caused the plaintiffs' injuries by fraudulently
misrepresenting the risk of abuse at the school prior to the
abuse of each individual plaintiff.  These injuries include the
abuse itself, as well pecuniary losses stemming from the abuse,

46

such as the cost of treatment and counseling.  Such allegations
fail under the first prong of the relevant test, because the
pre-abuse fraud did not occur subsequent to the injury that is
the basis of the other claims.  Compare id. at 545 (finding that
allegedly fraudulent statements designed to cover up injury from
a radiation leak met the first prong of the test because they
were "separate and distinct from the exposure"), with N.Y.
Seven-Up Bottling Co. v. Dow Chem. Co., 466 N.Y.S.2d 478, 480
(App. Div. 1983) (finding that allegations of fraudulently
misrepresenting the suitability of a material used to build a
faulty roof were merely incidental to the core products
liability claim because such misrepresentations pre-dated the
injury from the defective product and therefore did nothing more
than add an allegation of scienter to the products liability
claim).

     The other sort of fraud alleged in the complaint consists
of post-abuse misrepresentations as to the existence of viable
claims against the defendants.  (See, e.g., Am. Compl. ¶¶ 876-78
(alleging public representations as to the trustworthiness and
strong moral character of Gordon, which are argued to have
deceived the plaintiffs into believing they had no viable
claims).)  This alleged fraud passes muster under the first
prong, but fails the second prong of the test because it did not

47

cause injuries in any way distinct from the injuries arising from the alleged negligence, intentional torts, and Title IX violations.  And even if such post-abuse fraud exacerbated the alleged pecuniary injuries—for example, by making therapy more costly—exacerbation of an injury does not constitute a distinct additional injury.  See Corcoran, 202 F.3d at 545.

In their submissions, the plaintiffs argue almost exclusively from McGrath v. Dominican College, 672 F. Supp. 2d 477 (S.D.N.Y. 2009), that their fraud claims are independently viable.  The position in their papers is that because the McGrath court did not dismiss a fraud claim as incidental to the plaintiff's other claims—all of which were premised on the same injury—this Court should do the same when faced with analogous facts.  However, the court in McGrath had no occasion to rule on whether the fraud claims were pleaded for the sole purpose of evading a time bar, because none of the claims at issue in McGrath were time-barred.  Moreover, the plaintiffs here conceded at oral argument that the same injuries form the basis for all of their claims, including the claim for fraudulent inducement.  (See Oral Arg. Tr. 51.)[10]  Accordingly, even if the

---

[10] When asked by the Court whether the damages from fraud are distinct from the damages from negligence, counsel for the plaintiffs stated:

state-law fraud discovery rule were applicable to the fraud
claim in this action, that claim must nevertheless be dismissed
because it is merely incidental to the other claims.[11]


                              IV.

     The plaintiffs have filed a cross-motion for leave to file
a Second Amended Complaint pursuant to Rule 15(a) of the Federal
Rules of Civil Procedure in the event that the Court grants the
defendants' motion to dismiss the plaintiffs' First Amended
Complaint.  In support of this cross-motion, the plaintiffs
assert that new facts have come to light since the filing of
their First Amended Complaint, consisting of 1) information from
two new confidential witnesses about abuse by Finkelstein and
Gordon at YUHS during the 1950s and 1980s, and 2) a report by
Sullivan & Cromwell dated August 26, 2013, that was commissioned

---

        To the extent the negligence claim survives, your Honor, I
        would concede that the fraud claims may be dismissed as
        incidental.  I have no problem with that.  The difference
        with the negligence claim and the fraud is that the fraud
        claim, there was an accrual issue whereas in the negligence
        case, there is only an issue of equitable estoppel.

(Oral Arg. Tr. 51.)

[11] The defendants also argue that the plaintiffs have failed to
plead their fraud claim with sufficient particularity under the
requirements of Rule 9(b).  Because the fraud claim must be
dismissed as merely incidental to the other claims, there is no
occasion to address this argument here.

                              49

by YU in the wake of the December 2012 Jewish Daily Forward
article to investigate YU's alleged cover-up of sex abuse at
YUHS.

Rule 15(a) provides that leave to file an amended complaint
should be granted "freely . . . when justice so requires."  Fed.
R. Civ. P. 15(a)(2); see also Foman v. Davis, 371 U.S. 178, 182
(1962) ("Rule 15(a) declares that leave to amend 'shall be
freely given when justice so requires'; this mandate is to be
heeded." (citation omitted)).  However, the "futility of
amendment" is often cited as a valid basis for denying leave to
amend.  See Foman, 371 U.S. at 182; Williams v. Citigroup, 659
F.3d 208, 214 (2d Cir. 2011).  At oral argument, counsel for the
plaintiffs conceded that the information that has come to light
since the First Amended Complaint was filed does not change the
legal issues in this motion:

> THE COURT:     What is there in your allegations in support
> of an amended complaint that changed any of
> the legal issues before me on the motion to
> dismiss?
>
> MR. MULHEARN:  The issues in the amended complaint go to
> the Macy Gordon allegations in which the
> defendants stated in their papers, in the
> moving papers, that there were no prior
> allegations against Macy Gordon prior to
> 1980.  That was a categorical statement
> originally, and they backtracked somewhat
> with a  footnote in the reply memorandum
> saying this is what we alleged, but we now
> know, based on conversations after we filed
> the amended complaint, that there was

                              additional complaints made against Macy
                              Gordon, at least one, that was addressed far
                              before 1980.

                              . . . .

          THE COURT:     Anything else?

          Mr. MULHEARN:  No, your Honor.  Other than that, the legal
                         issues remain pretty much static.


(Oral Arg. Tr. 43.)  Given that the new information that has

come to light has no bearing on the fact that all claims in the

First Amended Complaint are untimely as a matter of law,

repleading in this action would be futile.  See Goodrich v. Long

Island R.R. Co., 654 F.3d 190, 200 (2d Cir. 2011) ("[W]ithout

any showing that the deficiencies in the complaint could be

cured, we must conclude that repleading would be futile.").

Accordingly, the plaintiffs' cross-motion for leave to replead

is denied.



                              CONCLUSION

     The Court has considered all of the arguments of the

parties. To the extent not specifically addressed above, the

remaining arguments are either moot or without merit.  Because

all claims in the Amended Complaint are time-barred, and because

none of the alleged exceptions to the applicable statutes of

                                 51

limitations save these claims from the time bars, the defendants' motion to dismiss is **granted.**  The plaintiffs have failed to make a showing that the deficiencies in the Complaint could be cured in a Second Amended Complaint.  Accordingly, the plaintiffs' cross-motion for leave to replead is **denied,** and all claims in the Complaint are **dismissed with prejudice.**  The Clerk is directed to enter Judgment dismissing the Complaint.  The Clerk is also directed to close all pending motions.

**SO ORDERED.**

**Dated:      New York, New York**
**            January 29, 2014**      _____/s/_____
                                      **John G. Koeltl**
                                      **United States District Judge**